IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CR-00246-M

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LEON BRICE JOHNSON,

    Defendant.

ORDER

This matter comes before the court on Defendant's pro se Motion for Early Termination of Supervised Release [DE 4]. For the following reasons, the motion is denied.

I. **Background**

On March 3, 2008, Defendant pleaded guilty in the Southern District of Florida to one count of conspiracy to smuggle aliens, in violation of U.S.C. § 1324; three counts of smuggling an alien resulting in death, in violation of 8 U.S.C. § 1324; one count of conspiracy to import five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 952(a) and 963; and one count of conspiracy to import five hundred grams or more of cocaine and a quantity of marijuana, in violation of 21 U.S.C. §§ 952(a) and 963.[1] DE 1-2; DE 1-3 at 11. These charges were predicated on the following facts:

From 2004 to 2008, Defendant and his co-conspirator, Rickey Thompson, smuggled foreign nationals and drugs into the United States from Freeport, Bahamas. PSR at ¶ 12.

---

[1] As a result of a plea deal, the following charges were dismissed: fourteen counts of smuggling an alien, three counts of second-degree murder, two counts of importing cocaine, one count of importing marijuana, and two counts of carrying a firearm in furtherance of a crime of violence. *See* DE 1-1, 1-2.

Thompson owned and operated several vessels outfitted for smuggling, and Defendant was his "second in command." *Id.* Thompson worked with recruiters to identify illegal aliens seeking transportation to the United States. *Id.* at ¶ 13. After charging the alien a fee ranging from $1,500 to $4,000, the alien would live in local apartment or hotel until Thompson was ready to leave. *Id.* The aliens were assured that Thompson would drop them off at a sandy beach on Jupiter Island Beach, Florida, or else, in water no higher than their ankles. *Id.* at ¶ 14.

On August 16, 2006, federal authorities apprehended seven illegal aliens and retrieved twelve kilograms of cocaine near Jupiter Island Beach. *Id.* at ¶ 18. One of those aliens, Torry Knowles, admitted to illegally entering the United States the night before aboard one of Thompson's boats and gave several statements to law enforcement. *Id.* at ¶ 20, 22. He stated that he and an individual known as "Yaddie" had transported thirteen kilograms of cocaine on behalf of a Bahamian drug trafficker using Thompson's services. *Id.* at ¶ 22. Despite having been promised that they would be taken to the beach, Thompson dropped off Knowles and several other aliens in deep water, roughly ten to twenty yards from the shore. *Id.* at ¶ 23. Several aliens protested, but Defendant pulled out his gun and began to push them off the boat. *Id.* Knowles stated that one of the protestors, a black Haitian woman, told Defendant she could not swim, but he pushed her into the water anyway. *Id.* Her body, and that of another man, were later found by law enforcement floating face-down about a half mile from the shore. *Id.* at ¶ 19, 26. An autopsy revealed both individuals died by drowning. *Id.* at ¶ 27.

On December 28, 2006, law enforcement again responded to information about a suspected migrant landing on Jupiter Island Beach. *Id.* at ¶ 28. Ultimately, they apprehended eleven individuals eventually identified as foreign nationals. *Id.* at ¶ 30. Several of the aliens informed law enforcement that they had been transported to the United States by Thompson. *Id.* at ¶ 32.

Most of them additionally identified Defendant as Thompson's second command. *Id.* at ¶ 33. As with the prior trip, Thompson ordered the aliens to jump off the boat before they reached shore. *Id.* at ¶ 34. Once they jumped, several struggled to keep afloat in the rough water. *Id.* One, Warren Nigel, had previously informed Thompson that he could not swim, and he began to yell for help. *Id.* Defendant helped Nigel to shore, but he ultimately died. *Id.* at ¶ 31, 34, 38. An autopsy showed that his lungs and stomach were full of sand, shells, and sea water and that his cause of death was drowning. *Id.* at ¶ 38.

On August 22, 2008, the Honorable Daniel T. K. Hurley sentenced Defendant to a total term of imprisonment of 264 months, to be followed by five years of supervised release. Defendant was released from federal custody on March 8, 2024, and on August 14, 2024, his supervision was transferred to the Eastern District of North Carolina. DE 1; *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited October 29, 2025).

About a year later, Defendant filed the pending motion. DE 4. He argues that his compliance with supervision, stable employment, and volunteer work at a food bank show that he is fully rehabilitated and ready to reintegrate into society. *See id.* at 3. He further advises that he desires to return to the Bahamas to serve as his parent's primary caregiver. *Id.* The United States counters that mere compliance with the conditions of supervised release does not warrant early termination and that his remaining term of supervision is necessary to reflect the gravity of the underlying offenses. DE 7 at 6–8.

## II. Discussion

The court has the authority to terminate a term of supervised release after consideration of the factors set forth in 18 U.S.C. § 3553(a) and the expiration of one year "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18

3

U.S.C. § 3583(e)(1). "The phrase 'the interest of justice' . . . give[s] the district court latitude to consider a broad range of factors in addition to an individual's behavior in considering whether to terminate the supervised release period." *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999). Early termination has been found to be appropriate "when the defendant has exhibited exceptionally good behavior that makes the previously imposed term of supervised release either too harsh or inappropriately tailored to serve general punishment goals." *United States v. Brown*, No. 3:19-cr-265, 2024 WL 3997079, at *1 (W.D.N.C. Aug. 29, 2024) (quoting *Folks v. United States*, 733 F.Supp.2d 649, 651 (W.D.N.C. 2010) (internal citation omitted)).

In this case, the court finds that the § 3553(a) factors weigh heavily against granting early termination. The underlying conduct reflects a callous, repeated disregard for human life and the rule of law, and it ultimately led to the death of three people. To be sure, Defendant completed the imposed term of incarceration, but supervised release was part of the punishment crafted by Judge Hurley in 2008. It "fulfills rehabilitative ends, distinct from those served by incarceration," and it is designed to assist Defendant in his "transition to community life." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Defendant argues that continued supervision "may hinder future opportunities," but this misunderstands the scope of supervised release. DE 4 at 3. It is not imposed merely to assist Defendant in securing employment; it is designed to allow the federal government to ensure that Defendant does not return to the behavior for which he was convicted. Here, particularly in light of Defendant's professed desire to return to the Bahamas—the country from which he helped operate a smuggling conspiracy—the court finds that early termination is inappropriate. Defendant has not yet served even a third of the imposed term, which continues to reflect the horrific nature of the underlying facts, promote respect for the rule of law, and provide

4

Case 5:24-cr-00246-M    Document 8    Filed 10/29/25    Page 4 of 5

deterrence to Defendant by ensuring that any future unlawful behavior is more likely to be detected by federal authorities.

For these reasons, Defendant's motion [DE 4] is DENIED.

SO ORDERED this 29th day of October, 2025.

*Richard E Myers II*
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE